May it please the Court. I practice law in a little town called Hampton, South Carolina, and the reason I mention that is right across the street from me, I can see it from my porch, is another law firm. And by the strangest of circumstances, these two law firms represent separate plaintiffs who have brought actions against the government for FDA's tomato policies, tomato program, back in June of 2008, challenging what FDA did. The other case was the Williams case. My client is Seaside Farms, which is a family farm down in Beaufort, South Carolina. The reason I mention Williams is Judge Howe was assigned both the Williams case and the Seaside case. The facts are somewhat different. Williams involves primarily Florida tomatoes. Williams didn't raise Indian towing.  His client failed to properly execute his decision. But at the end of the day, both cases challenged what FDA did during a one-week period in June of 2008. What is important, what provides a little landscape for this appeal, is the fact that for reasons Judge Howe never explained, he granted Williams full discovery and he granted us limited discovery. He never explained that, and the government has never tried to justify that. And that is the predicament that Seaside is in before you today, arguing both substance and wanting to argue substance, but saying to you... With respect to the discovery and your desire for more discovery, didn't you have three years of discovery? We had two-and-a-half years of efforts to get discovery. And we have summarized, if I had taken the whole brief to cite case-first and stanza on our discovery issues... I thought you got a lot of documents, including guidance documents and everything. You were digging and digging for some sort of mandatory directive that would cover your situation, and I thought you got a lot of guidance documents and manuals of all sorts and everything, but it just wasn't there. Why would we, after three years of discovery, why would we send this back for more discovery? Judge Wilkinson, in direct answer to your question, we did get a lot of documents. That's not the brunt of my criticism. But what we didn't get was a discovery on the facts. We wanted to develop the factual record to, among other things, show that the government did not execute its decision in a reasonable way. And it did not follow those decisions. You talk about not executing it in a reasonable way, but that's the very way you frame that brings it within what we've been talking about this morning, which is the discretionary function exception. And I want to talk about the discretionary function exception. See, what you're saying is that it wasn't implemented in a reasonable way, and, in other words, you're saying that the discretion was abused. But the way the statute reads, it says the discretionary function attaches whether or not the discretion is abused. And so you have an independent question there. Again, you don't think it was a reasonable call, but that's a question of whether the discretion was or was not abused. But the statute is very carefully framed to say that this exception attaches whether or not the discretion was abused. It could be an act of negligence. It could be unreasonable. And the district court limited discovery on the facts of it because it didn't pertain to this threshold issue. Well, Your Honor, I'm going to address Your Honor's question and not the path I was going down. I appreciate Your Honor's concerns. I will say that we have devoted a significant section of the brief outlining all the things we don't know today. However, let's walk back and say, what is the law of the case? What does a discretionary function mean? I adopt what Judge Howe said in 2012 when he denied the motion, the 12B1 motion and a motion for summary judgment, and said that I would have discovery. Now, I disagree with him on limiting the discovery, but if we read what Judge Howe said about the discretionary function and what we had to do, it was Judge Howe said that we could challenge what the government did. He called them good arguments that we had made. He gave you the discovery on the pertinent issue, which was whether there was a discretionary function involved. And the discovery, he pointed the discovery toward the question of whether there was some mandate or something that deprived the director here of the FDA and the appropriate decision maker of discretion with respect to the issuance of this warning. And he says after three years of discovery, you haven't come up with any kind of regulation or statute that limits the discretion of the government in what I think the district judge realized was the ultimate discretionary decision, which is given the facts and circumstances as varied as they are, the question of whether or not to issue and where to issue it and how to phrase it and all the rest would seem to be the very prototype of a discretionary decision. That's a lot to chew on, but let me try. Number one, Judge Howe said I could have discovery on whether it was properly executed and on Indian towing, the Good Samaritan Rule, a whole line of cases. That was a discovery we don't think we got. Number two, Judge Howe gave Williams complete discovery, same issues on discretionary function. In one sense, it ought to have been reversed in what he did, but Williams got full discovery. And after Judge Howe sets this case for trial, if there's one thing people in South Carolina know, I think, is Dan Spites is a tenacious litigator of trying to get discovery. And after all of these efforts and all of the problems we outlined, after he sets it to trial, the government dumps 13,000 documents on us from the Williams case. And when the government agreed to their credit that we could have 60 days to examine those documents before briefing issues, Judge Howe refused that. But, Karen, one step further, Your Honor. Oh, I thought he ended up giving you, because both of you supported the extension, and he finally gave it to you. No, what he did was he revised the proposed stipulation. They could file a motion for summary judgment and said to file it in ten days. Didn't he postpone the hearing? No, Your Honor. No, Your Honor. So we were in that position. But let's go back even one square further. Kern says you shouldn't decide a 12B1 motion based upon, you know, anything short of that. I've heard you criticize Judge Howe. Now, I'm sitting here thinking for a little bit. Is it the fact that Judge Howe gave you some, he didn't dismiss the case early on and gave you some latitude to discover, to get some information and make your case? Isn't that what he did? Judge Howe? Is that what he did? Yes, Your Honor. Wait, wait, no. All right, he did. But you take that as a negative on Judge Howe that he gave, because you acted as if that was negative. You said, well, Judge Howe did this. He didn't rule it first, said we made good arguments, and let us get some discovery. But he did that to benefit you, didn't he? I think . . . Yes or no, that didn't benefit the other side, did it? He did do it to benefit me. Okay. But he made a legal . . . That's what he should have done, but not limited. You'll get a chance to say all that you want to, but I'm trying to understand, because you know what? People know you in South Carolina as a tenacious person for discovery. Those who know me know I ask a lot of questions that won't pinpoint answers. But my point is, just at this point on the line of point, are you somehow using what Judge Howe did, I thought you suggested, by saying you had a good idea, maybe a good argument, you should get some discovery, are you somehow now saying that undercuts his determination that he made? When he made a . . . Early on in the case, he made what looks like kind of a favorable commentary towards you. That's not a negative . . . The fact that he did that doesn't weaken his decision against you, does it? That fact alone. No, sir. Let me explain. Okay. Now, I understand what I think you're going to say. That was the impression I got from what you said. Well, I'm sorry if I did that, because I've actually known Judge Howe since I was a law clerk with the firm when he tried a case against our firm. I have great respect for Judge Howe. I do, too. I know him very well. And I'm not him. But I understand your argument, because it seemed to me he was trying to help you. I know you weren't satisfied with all the information you got, and you're not satisfied with the final ruling, and you think he's erred. I understand all that. That's completely improper. Well, let me say this in fairness to Judge Howe. I do think Judge Howe . . . I don't understand why he didn't go as far as Williams. For the life of me, I can't understand that. But when I left the courtroom that day in 2012, I wasn't upset with Judge Howe. Sure, I would have liked full discovery, but the way I interpreted his aura, what he was trying to do was to give me all the information I needed. And when you read the aura, the discovery doesn't just relate to what policies does the government have. It relates to, as well, what did the government do in trying to implement those policies. The thing about it is the . . . I look at this discretionary function exception in much the same way that you look at a qualified immunity. And both . . . The qualified immunity cases and the discretionary function cases, they rest on what seem to me to be two premises. One, that government has to have a certain latitude and a certain discretion even to function properly. And that the other thing that both of these . . . both qualified immunity and the discretionary function exception rest on is that you don't try to 20-20 hindsight every government decision that's made under very stressful circumstances by people on the spot who have a limited amount of time in which to make a decision that has implications for the public welfare and for the economic well-being of companies and a lot of other things. But it's just a practical judgment at the core of both qualified immunity doctrine and the discretionary function exception that there has to be some latitude for people to function, for government to function without getting tied up in a massive amount of litigation. That's the value that's protected here. Why didn't Judge Howe protect that essential value? Why didn't his decision go right to the core of what the discretionary function exception was designed to do? I believe Judge Howe's 2012 order outlined exactly the roadmap that we needed to follow. I believe that Judge Howe . . . I have no way of knowing this, but I believe it was implicit in the question that I can opine. I believe Judge Howe thought that by giving us the roadmap and the limited discovery to explore that roadmap was giving us the discovery we needed. But, but, but, the government took that and for three years said, we won't give you this because it doesn't relate to what Judge Howe outlined. The government's position consistently to their credit was that they would give us only the procedures and guidelines, et cetera. And that's what threw this case off kilter. And in fairness to Judge Howe, Judge Shedd, Judge Howe generally ruled with me on all the discovery motions. And then we'd go back out again and same old song. I know that's why he'd be so surprised you were speaking ill of him. Well, I mean, it wasn't until the very end when all of a sudden, and for reasons of the question in the record, and we think may be related to Williams, but leaving all that aside, it wasn't the very end. He says, okay, I'm going to set this case down for trial. They want to file a motion for summary judgment. Do you think . . . I'll ask you this to be fair to you. Do you think the biggest error that Judge Howe made was in limiting discovery or in ruling incorrectly on the law? What do you think his big error was in this case? Misapplying the law? Not as to discovery. I mean as to tort claim or limiting or cutting short your discovery. Well, I think they were both big. But I believe if I'd have had my full discovery, Judge Howe would have been a much better chance. He wouldn't have ruled the way he did on the law. But to fully answer your question, perhaps the biggest issue I have with Judge Howe is after we go argue, brief and argue the motion for summary judgment, after briefing it and after argument, he flips it and says, this is a 12B1 motion, and he flipped the burden of proof. The government had the burden of proof on the motion for summary judgment. Once he made it a 12B1 motion, I'm not only fighting uphill without my discovery, but I'm fighting a burden. Thank you, Counsel. Thank you. Mr. Sheehan. May it please the Court. Mike Sheehan for the United States. I want to refocus this inquiry on what I think is the key question in the case. That is whether there is any constraint on the FDA's ability to issue consumer advisories when there is an emergent public health crisis. The relevant statute is 21 U.S.C. 375, and there is no mandatory limit there. That statute says the FDA has authority to disseminate information regarding food in situations involving, in the opinion of the Commissioner, imminent danger to health. And then, in the course of discovery, the government turned over to Seaside Farm every single applicable regulatory policy manual. And there's nothing in those manuals either that imposes any sort of mandatory restriction on when the Commissioner of the FDA can warn consumers that some food that they're about to eat might be dangerous. The absence of any restriction on what the FDA Commissioner could do when issuing a warning disposes of this case as the district court correctly held. Now, I didn't hear in the initial argument any assertion of any mandatory duty anywhere. But what I thought Seaside's counsel was arguing was that they didn't get enough information they needed to litigate this case properly. And that claim is incorrect. The only thing that they needed to litigate this case at the discretionary function exception level was all of the policy documents, all of the applicable regulations, and all of the applicable internal guidance that might contain a mandatory restriction here or a mandatory restriction there. So the government turned over all of those documents to them, and they have never alleged that there might be another document floating around somewhere in the ether that the government did not. It's not quite to the contrary because the statute by itself confers discretion in the language it talks about in the opinion of the Commissioner. That's absolutely right, Your Honor. And there's a good reason why there is no mandatory duty found in any of these internal guidance documents. It's because public health emergencies are all unique creatures. So establishing mandatory duties that would require the agency, for example, to follow a certain set of procedures before issuing a consumer warning might be appropriate for one form of emergency but might be dramatically inappropriate for another form of emergency. It can actually be simplified a little bit to the type of discussion questions I was asking in the prior case. The government is charged with making a decision that balances the interests of the economy, the tomato growers, their products on the one hand, and the public safety on the other hand. And at one point it may say nothing because it's going to ruin a whole economy, a whole sector of the country. On the other hand, it has to consider that people will get sick, many people, and that's within its mission to protect too. And it seems to me that this has got to be, regardless of all the factors that are mandated in pages and manuals, it's got to be a decision, a discretionary judgment call. If the judgment call is wrong or abusive, it's protected because that's exactly what the Tort Claims Act was passed for. Well, it was the SEC and the FDA or whatever it was back then. These types of decisions where you have two big decisions, at least two, and here I'm sure there were many more because there was a lot of fact-finding. They had to evaluate the facts. They found that their facts were wrong. They had to change positions and then had to make judgments about what to say. And in the end, they did hurt the South Carolina crop. But it wasn't because of a tort that's recognized. It was because of a judgment call that was made. I completely agree with that, Judge Niemeyer, and I think that illustrates the oddity about this case because Seaside Farm is trying to use the medium of tort to second-guess the manner and the mode in which the FDA issued these consumer advisory warnings. I take their position to be something along the lines of the FDA should have waited to inform consumers until it had stronger science, or the FDA should have changed some of the phrasing. These are very, very hard questions. And as my colleague points out, it's a very delicate balance. And if you don't issue a warning and you wait for more evidence, you can always wait and hope that something will become absolutely and definitively conclusive. But if you wait too long and delay in giving consumers a warning and they ingest food that leads to serious illness or death, that in itself is a prescription for massive litigation. And what we cannot do is set up a series of incentives for the government to fail to get warnings when consumers may, with their very lives at stake, need a timely warning. And it's both an art and a science. But this is probably the prototypical discretionary call. It's framed that way in the statute and the regulations. And even more so, you can understand the practicality of it. You're weighing how likely is it that a business is going to be hurt by the warning. But on the other hand, how likely is the failure to give a warning going to lead to consumers suffering serious foodborne illnesses? I mean, it's a real crunch time at the FDA. They're under tremendous pressure to make the right call. And given all the variables and the scientific evidence and the evidence from the field and given all the different forms in which food contamination can take and the different items of food that it can exist in, you can't just blueprint these kind of things and say, do this, do that, do this this way, do that that way. The whole problem just doesn't lend itself to that sort of rigidity. Exactly, Your Honor. And this Court has actually said as much in the Holbrook case. You know, though, Mr. Spites has a reputation as a very strong lawyer, and he has pitched this case on discovery. At least you heard his argument. Yeah. I'm going to ask you this. Why do you think he's pitching his argument on discovery? And secondarily, what is it that he wanted that you didn't give him? So as to the first question, Your Honor, I'm afraid I can't speak to that. You don't have any idea. I don't have any idea why. If I had to speculate, it's because of the absence of any sort of mandatory information or mandatory restriction in a statute or a piece of regulation. But as to what Mr. Spites is looking for, I think. Let me add this to my question, because it strikes me that at some point Mr. Spites has to run up against the law, which looks pretty strongly, as you argue it and as my colleagues have commented on it. But there's something else at play, and I'm trying to figure out what that is. Do you have some idea what that might be? Yeah. So if I had to hazard a guess, Your Honor, it would turn on this case called Rich, which this Court handed down about a year ago. And in Rich, the government asserted a discretionary function exception claim, and the Court affirmed the district court as to one portion of it, but remanded for additional discovery on another portion of it. And the remand was so the plaintiff there could have additional discovery to try to get any, like, additional guidance documents that could have existed that were referenced in the guidance documents that the plaintiff already got that the government did not turn over. So in Rich ---- Did he add any indication in discovery in this case that's what he's seeking? So Mr. Spice asked the government to turn over precisely that as well as a whole lot of other stuff. And the district court's order encompassed precisely that and a whole lot of other stuff. And the government disclosed very early on in discovery at a deposition with a senior FDA official. Did you disclose more in the Williams case than you disclosed in this case? As to the fundamental policy documents ---- Did you or not? I can't say that for sure, Your Honor, because I'm not familiar with the scope of the discovery in the Williams case. But what's important there is that even if the government did, we produced all 13,000 pages of the Williams farms discovery to them as a gratuity almost, even though we thought that the discovery requests that they had made were, in fact, overbroad. But the critical point about discovery ---- Did it squeeze his time in front of the judge on the summary judgment argument? No, Your Honor. And I don't think that it was motivated by anything other than, you know, we want to make sure everybody has it. Did it squeeze him on the time on summary judgment argument? According to Mr. Spice, he says that it did. But the judge extended the period of time at the parties' joint request by 15 days so that the parties could have the ability to review those disclosures. But the key point is that nothing in those disclosures was important to the threshold inquiry in this case. The threshold inquiry is, is there a mandatory restriction? Then why did Judge ---- And tell me why you think Judge Howe, as Mr. Spice described it, turned the summary judgment back into a motion to dismiss. So I think that's because of ---- Again, I can't speak to what's in Judge Howe's head. But I think that's because of a case that this Court issued called Williams, in which you held that the proper result when the discretionary function exception applies ---- There's no jurisdiction. There's no jurisdiction, so 12b-1 is appropriate. And so far from making any sort of error, we think Judge Howe did exactly the right thing in conformity what this Court is asking for. So at the end of the day, this case is at the heartland of what the discretionary function exception is meant to protect. There is no mandatory ---- But a lot of what Mr. Spice was arguing was about, quite frankly, how Judge Howe handled the case. And I'm just going through, and it seems to me with your explanation and the way I look at it, that Judge Howe is doing what district judges do sometimes. They don't know the end of the case yet, so they're going along trying to make the right decision and treating people fairly as you go along. And then you either narrow discovery or broaden discovery, and then you ---- And then when you get to the end of the case and the laws develop and you understand the facts, you may decide it's not summary judgment. It may be 12b-1. It may be jurisdictional. But I just ---- I was just trying to understand how Judge Howe did it. It makes sense to me, I will say, and I'll ask you if you saw anything to the contrary. No, it makes perfect sense. He just walked through it the way that sort of ---- It's real world. It's real life. And you're going through a case. Mr. Spice doesn't know exactly 100 percent what his argument is going to be, and you don't know what his argument is going to be unless it's in your defense. And you're both just sort of, the government and Mr. Spice, you're both just trying to get the information and frame the arguments and frame the legal issues, and the judge is sitting above that trying to figure it all out. I just ---- Your take is that's what Judge Howe did in this case. I think the critical illustration that Judge Howe's administration on this case made sense is this. The government initially moved to dismiss this case in 2012, and we said the discretionary function exception, among other exceptions, applies. Judge Howe said, well, it's possible that FDA has some mandatory procedures out there. I don't know the answer to that, and you haven't told us. So we'll have some limited discovery to see whether there are mandatory procedures. We disclosed every single applicable guidance document, every single applicable policy, and at the end of the day ---- So why isn't this a complete discretionary function? It absolutely is, and that makes good policy sense. So unless the Court has any further questions ---- We have no more. Thank you. We urge that the judgment of the district court be affirmed. Thank you. I need to speak fast. The second line of my outline was I'd like to deal with procedural issues in the context of the substantive issues. I did not mean to put all my argument on procedure, but I understand that. I opened that door when I talked about my front porch at my office in the Williams case. Well, you have some time to go another direction now if you want. Well, let me go something. I can't cover it all, but hopefully our brief is good on these points. The first thing we must keep in mind is the June 7 press release. That's what brings us here. I agree with, you know, FDA has to have discretion. I don't want to eat bad tomatoes, and I don't want my children to eat bad tomatoes. That's not the issue. But the June 7 press release followed up on an earlier one that sent out a warning about tomatoes. The June press 7 release actually says that my tomatoes are safe. So I applaud FDA for recognizing that South Carolina tomatoes are safe. In fact, in the motion for summary judgment, which brings us here today, they didn't talk about many things that they now present to you. They said that the purpose of this press release on June 7 was to tell people across the country that there were safe tomatoes available, and that was their purpose. Aren't you now arguing the merits of the warning and the merits of the judgment that the FDA made? I don't even know if it was a warning, but I'm not arguing the judgment that my tomatoes are safe. I applaud that judgment. But your argument, I think your argument on discovery and this argument you're making is basically that the FDA was so off base in what they did and how they handled the information that they had that they have to be negligent. In other words, they had no basis for making some statements, or they had lousy information as to others. The logic didn't follow from what they had in their own files. And all of this type of criticism goes to the merits. It seems to me if the FDA got it totally wrong, they still were making these judgment calls as to what to say in balancing what you said, the tomato crop in South Carolina. They were trying to preserve it, but then at some other point they changed their mind. And it seems to me these are all almost definitionally discretionary judgments to make. I don't think it's that, Judge. First of all, we know they got it wrong. It was jalapeno peppers in Mexico that caused the problem. That's not what I'm complaining about. They made a bad judgment on that. I'm not complaining about that. What they did was to put, when they expanded this notice, they put South Carolina, which was just harvesting tomatoes that day, they put South Carolina tomatoes in the bullseye when they recognized and say that they tried to tell people, to execute their decision properly, to tell people that South Carolina tomatoes and some others were safe. And they did that after. There's about a 20-hour period. Counsel, isn't this arguing the merits of the course of action? I keep trying to emphasize that the statute says whether or not the discretion be abused. They wanted to simply safeguard some discretion in an area which just has vital consequences for whether people live or die. I mean, suppose terrorists were to contaminate, and that's not a far-fetched hypothetical, were to contaminate the food supply in some way. We may well want the FDA, if they're presented with evidence of that, to take the most prudent course. And they may feel that they have to issue a broader warning to enable consumers, alert consumers to the danger and enable them to make their choices cautiously. But to try to tie all this up in massive litigation just seems to me to allow the people to take, to commit very dangerous acts with respect to the safety of our food. And the FDA, when it's sitting around the table, wanting to inform consumers of the dangers of consuming, they say to one another, well, you know, we better hold off on this because there's this Fourth Circuit decision out there that will tie us up in litigation for ages and second-guess us at every turn of the road. And I don't think Congress wanted that to be part of the discussion. I think they wanted the discussion to be, what's the best thing to do in the public interest? What's the best thing to do with respect to the companies and the economics involved? And what's the best thing to do for public safety involved? And when you say that the discretionary exception, dysfunction exception, doesn't apply, what you introduce is a rat of litigation into the whole dynamic and into the whole discussion and decisions of vital public input are made about whether there's going to be or not going to be litigation as opposed to what the economy and the public health demands. It changes the whole dynamic of the decision-making process to move this outside of the discretionary function exception. I just want you to know where I'm coming from because I don't, for a minute, make light of the injury to the tomato farm and to the tomato harvesters. And I understand that they feel very aggrieved. And it's no small matter that you're advancing, and I respect you for it. But I just want you to understand, I think it changes the whole nature of the process if we take a sympathetic case and go the wrong way with it. Respectfully, most respectfully, Judge Wilkinson, we're trains passing in the night. I'm not sitting here arguing what you're saying about the purpose of the statute, et cetera. What I'm saying is that I agree with FDA. FDA said it's important to tell consumers that there are safe tomatoes out there, including in South Carolina. Hallelujah! Now let's talk about whether they executed that decision. Let's talk about why they won't give us the information they gave to the retailers. Let's talk about why they won't TV stand all tomatoes at once. Could I ask you a question? Yes, sir. You have talked a lot about what your case is not about and the discovery you didn't get. I'm interested in knowing, is there some level of abuse that you believe takes this case out of the discretionary exception? Yes, Your Honor. And what is that? Where is that supported? Where's the law for that? Let me start with the facts first. No, no, I understand the facts. I mean, there are facts that we've never discussed that are central to that. But dealing with the law, Judge Houck said you must execute it in a reasonable way. FDA says the purpose of the June 7th notice was to tell people they are safe tomatoes. Okay? Judge Houck said the law correctly. We haven't even got to Indian towing. The law is they acted as a good Samaritan. Great Samaritan. They're going to tell the world that I have safe tomatoes. And yet how do they do it? They bury it in a small line on a notice posted on the website on a Saturday night. They have not told us anything about why they changed from Mexico to there because in the last 24 hours. So we have that going forward. And then what do people rely on? People rely on, that's the testimony in this case, they rely on retailers to protect consumers from getting bad tomatoes. And FDA, back to discovery, I apologize, has never provided us what it provided to retailers. So the whole world was running around thinking all tomatoes were bad. And yet sitting in South Carolina, the tomatoes being picked at that time, that got swept under that. And I don't think they were a good Samaritan when they did it that way on the Indian towing, which the U.S. Supreme Court recently recognized again. And I don't think they executed the policy, the policy being to tell people they are safe tomatoes. We're not dealing with the June 3 warning. We're dealing with June 7 press release. Anything else, sir? If you'll give me an hour, I would take it, Your Honor. But I believe you've been very generous in giving me a little over. Well, I want to say that we appreciate your argument. We'd like to adjourn court and come down and say hi to you. Hi. This time, of course, stands adjourned until tomorrow. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Dennis W. Shedd